1  Joshua J. Pollack (SBN 215922)
2  PROSKAUER ROSE LLP
   2049 Century Park East, Suite 3200
3  Los Angeles, CA 90067-3206
4  Telephone: (310) 557-2900
   Facsimile: (310) 557-2193
5  jpollack@proskauer.com

6
7  Peter J.W. Sherwin (Applying for *Pro Hac Vice* Admission)
   Jonathan G. Ellison (Applying for *Pro Hac Vice* Admission)
8  PROSKAUER ROSE LLP
   Eleven Times Square
9  New York, NY 10036
10 Telephone: (212) 969-3000
   Facsimile: (212) 969-2900
11 psherwin@proskauer.com
12 jellison@proskauer.com

13 Attorneys for
14 O2CNI CO., LTD.

FILED
JUN 1 4 2013
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

                  UNITED STATES DISTRICT COURT
15
16                NORTHERN DISTRICT OF CALIFORNIA  CRB
17
18 *In re Ex Parte* Application of:
                     CV 1 3  Case 80  1 2 5 MISC
19 O2CNI CO., LTD.,

20                          Applicant.
21
22
23
24
25
26
27
28

| | |
|---|---|
| | **DECLARATION OF KWANGNAM SON IN SUPPORT OF O2CNI'S *EX PARTE* APPLICATION FOR AN ORDER PURSUANT TO 28 U.S.C. 1782 GRANTING DISCOVERY FOR USE IN FOREIGN PROCEEDINGS** |

BY FAX

DECLARATION OF KWANGNAM SON IN SUPPORT OF O2CNI'S *EX PARTE* APPLICATION
FOR AN ORDER PURSUANT TO 28 U.S.C. 1782 GRANTING DISCOVERY FOR USE IN FOREIGN PROCEEDINGS

1      I, Kwangnam Son, Esq., hereby declare:

2      1.     I am an attorney admitted to the Bar of Korea and am a member of the

3 firm Hyun Law, attorneys for O2CNI Co., Ltd. ("O2CNI").

4      2.     I make this declaration on behalf of O2CNI in support of its *ex parte*

5 application for an order pursuant to 28 U.S.C. 1782 granting discovery for use in

6 criminal proceedings currently pending in Korea (the "Korean Criminal

7 Proceedings"). Except as otherwise indicated, I have personal knowledge of the

8 facts set forth below and, if called as a witness, could and would testify competently

9 thereto.

10      3. I have reviewed O2CNI's request for investigation, complaint,

11 supplementary complaint and request for punishment, annexed to the declaration of

12 Hee Shin as Exhibits A, B, C, and D, respectively, in which O2CNI alleges that

13 eight individuals (Yeong-Oh Yeom, Yong-Seok Song, Dae-Yeol Kim, Yong-Ho No,

14 Seong-Gyeong Kim, Seong Yun, Steven James Owyang and Kevin Paul Chapman)

15 and three corporate entities (Symantec Corporation, Symantec Asia Pacific PTE Ltd.

16 and Symantec Korea Ltd.) (collectively, the "Accused") violated the Korean Unfair

17 Competition Prevention and Trade Secret Protection Act and wrongfully acquired,

18 used, and disclosed O2CNI's trade secrets. Under Korean law, these offenses are

19 punishable by up to ten years of imprisonment and the imposition of a punitive fine.

20      4. On information and belief, the Korean Criminal Proceedings are

21 currently being conducted by the Korean Public Prosecutor's Office. The Korean

22 Public Prosecutor's Office has broad investigative powers to conduct interviews and

23 collect documents, both before and after formal charges have been filed.

24      5. However, the Korean Public Prosecutor's Office does not have the

25 power or ability to collect documents from or conduct interviews of individuals

26 located in the United States, except with the assistance of the United States

27 government or judiciary. Korea and the United States are signatories to a Treaty on

28

2

DECLARATION OF KWANGNAM SON IN SUPPORT OF O2CNI'S *EX PARTE* APPLICATION
FOR AN ORDER PURSUANT TO 28 U.S.C. 1782 GRANTING DISCOVERY FOR USE IN FOREIGN PROCEEDINGS

1  Mutual Legal Assistance in Criminal Matters, pursuant to which the Minister of
2  Justice or his designees may request the assistance of the United States government
3  with the collection of documents and testimony within the United States in aid of an
4  ongoing criminal proceeding in Korea. A copy of the aforementioned treaty is
5  annexed hereto as Exhibit A.

6       6. I am aware of no provision of Korean law that would preclude O2CNI
7  itself from seeking the assistance of United States courts to obtain discovery in aid
8  of the Korean Criminal Proceedings.

9       7. Indeed, under Korean law, any accuser, victim or third party to a
10 ongoing or anticipated criminal proceeding is permitted to collect documents
11 evidencing the criminal conduct at issue, and submit such documents to the Korean
12 police or the prosecutor's office in aid of the proceeding. The police and prosecutor
13 will generally consider any evidence submitted by victims, accusers or third parties,
14 and, to the extent the prosecutor's office finds the evidence to be credible and
15 helpful, may rely on it in an eventual prosecution.

16      8. In addition, given that O2CNI is the victim of the criminal conduct at
17 issue in the Korean Criminal Proceedings, O2CNI has the right to attend all
18 proceedings in connection therewith, and to present witness testimony directly to the
19 Korean criminal courts. Specifically:

20         a. Article 294-2 (Right of Victim to Make Statements) of the
21            Korean Criminal Procedure Act provides that "[t]he court shall,
22            upon receiving a petition from a victim of a crime or his legal
23            representative (including his spouse, lineal relative, sibling, if the
24            victim is dead, hereafter referred to as "victim" in this Article),
25            admit such victim as witness for examination;" and
26         b. Article 8 of the Korean Crime Victim Protection Act specifies
27            that the court "shall ensure that the crime victim is afforded the
28

1   criminal procedural rights to exercise, including the right to
2   consult with a criminal investigator with regard to the relevant
3   criminal case or to attend the trial or other proceedings and make
4   a statement."

5   I declare under penalty of perjury under the laws of the State of California
6   and the United States of America that the foregoing is true and correct.

7

8   Executed on: June 13, 2013

    _____
    Kwangnam Son

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit A

# Exhibit A


AUTHENTICATED
U.S. GOVERNMENT
INFORMATION
GPO

I

| 104TH *1st*<br>*Session* | SENATE | TREATY DOC.<br>104-1 |
|---|---|---|

TREATY WITH THE REPUBLIC OF KOREA ON
MUTUAL LEGAL ASSISTANCE IN CRIMINAL MATTERS

---

## MESSAGE

FROM

# THE PRESIDENT OF THE UNITED STATES

TRANSMITTING

THE TREATY BETWEEN THE UNITED STATES OF AMERICA AND
THE REPUBLIC OF KOREA ON MUTUAL LEGAL ASSISTANCE IN
CRIMINAL MATTERS, SIGNED AT WASHINGTON ON NOVEMBER
23, 1993, TOGETHER WITH A RELATED EXCHANGE OF NOTES
SIGNED ON THE SAME DATE



JANUARY 12, 1995.—Treaty was read the first time and, together with
the accompanying papers, referred to the Committee on Foreign Rela-
tions and ordered to be printed for the use of the Senate

U.S. GOVERNMENT PRINTING OFFICE

99-112                    WASHINGTON : 1995

### LETTER OF TRANSMITTAL

THE WHITE HOUSE, *January 12, 1995.*

*To the Senate of the United States:*

With a view to receiving the advice and consent of the Senate to ratification, I transmit herewith the Treaty Between the Government of the United States of America and the Government of the Republic of Korea on Mutual Legal Assistance in Criminal Matters, signed at Washington on November 23, 1993, with a related exchange of notes signed the same date. Also transmitted for the information of the Senate is the report of the Department of State with respect to this Treaty.

The Treaty is one of a series of modern mutual legal assistance treaties that the United States is negotiating in order to counter criminal activities more effectively. The Treaty should be an effective tool to assist in the prosecution of a wide variety of modern criminals, including members of drug cartels, "white-collar" criminals, and terrorists. The Treaty is self-executing.

The Treaty provides for a broad range of cooperation in criminal matters. Mutual assistance available under the treaty includes: (1) taking testimony or statements of persons; (2) providing documents, records, and articles of evidence; (3) serving documents; (4) locating or identifying persons or items; (5) transferring persons in custody for testimony or other purposes; (6) executing requests for searches and seizures; (7) assisting in forfeiture proceedings; and (8) rendering any other form of assistance not prohibited by the laws of the Requested States.

I recommend that the Senate give early and favorable consideration to the Treaty and give its advice and consent to ratification.

WILLIAM J. CLINTON.

Exhibit A, Page 7

## LETTER OF SUBMITTAL

---

DEPARTMENT OF STATE, WASHINGTON, November 17, 1994.
The PRESIDENT,
*The White House.*

THE PRESIDENT: I have the honor to submit to you the Treaty between the United States of America and the Republic of Korea on Mutual Legal Assistance in Criminal Matters (the "Treaty"), signed at Washington on November 23, 1993, together with a related exchange of notes signed on the same date. I recommend that the Treaty and the related exchange of notes be transmitted to the Senate for its advice and consent to ratification.

The Treaty covers mutual legal assistance in criminal matters. In recent years, similar bilateral treaties have entered into force with Argentina, THe Bahamas, Canada, Italy, Mexico, Morocco, the Netherlands, Spain, Switzerland, Thailand, Turkey, the United Kingdom (concerning the Cayman Islands), and Uruguay. Other similar treaties have been signed and ratified by the United States (but have not yet entered into force) with Belgium, Colombia, and Jamaica. In addition, treaties with Nigeria and Panama have been transmitted to the Senate and await Senate consideration. This Treaty contains many provisions similar to those in the other treaties. It will enhance our ability to investigate and prosecute a variety of offenses, including violent crimes, drug trafficking, and fraud and other white-collar crimes. The Treaty is designed to be self-executing and will not require implementing legislation.

Article 1 contains a non-exhaustive list of the major types of assistance to be provided under the Treaty, including taking the testimony or statements of persons; providing documents, records, and articles of evidence; serving documents; locating or identifying persons or items; transferring persons in custody for testimony or other purposes; executing requests for searches and seizures; assisting in forfeiture proceedings; and any other form of assistance not prohibited by the laws of the Requested State. The scope of the Treaty includes not only criminal offenses, but also proceedings related to criminal matters, which may be civil or administrative in nature. The article makes it clear that the Treaty is not designed to be utilized by nongovernmental parties or institutions who seek evidence for use in solely private matters. Similarly, the Treaty is not intended to create any right in a private person to suppress or exclude evidence.

Article 2 provides for the establishment of Central Authorities and defines the Central Authorities for purposes of the Treaty. For the United States, the Central Authority is the Attorney General or a person designated by the Attorney General. For the Republic

(v)

vi

of Korea, the Central Authority is the Minister of Justice or a person designated by the Minister of Justice.

Article 3 sets forth the circumstances under which a State may deny assistance under the Treaty. A request may be denied if it relates to a political or military offense that would not be a crime under ordinary criminal law, or if the Central Authority of the Requested State has substantial grounds to believe that compliance with the request would promote prosecution or punishment based on race, religion, nationality or political opinion. In addition, a request may be denied if its execution would prejudice the security or similar essential interests of the Requested State.

Article 3 also gives the Requested State the discretion to deny assistance if the conduct that is the subject of the request would not constitute an offense under the laws of the Requested State. This basis for denial, however, does not apply if the conduct in question falls under one of 23 categories of serious crimes described in the annex to the Treaty, for which assistance must be provided without regard to whether the conduct would be punishable under the laws of the Requested State.

Before denying assistance under Article 3, the Central Authority of the Requested State is required to consult with its counterpart in the Requesting State to consider whether assistance can be given subject to such conditions it deems necessary. If the Requesting State accepts assistance subject to conditions, it shall comply with the conditions. If the Central Authority of the Requested State denies assistance, it shall uniform the Central Authority of the Requesting State of the reasons for the denial.

Article 4 prescribes the form and content of written requests under the Treaty, specifying in detail the information required in each case. The article specifies further information to be provided to the extent necessary and possible to assist in locating individuals and effecting particular types of assistance. Unless otherwise agreed, all requests and supporting documents shall be in the language of the Requested State.

Article 5 requires the Requested State to comply promptly with a request, or to transmit it to the authorities with jurisdiction to do so. The competent authorities of the Requested State shall do everything in their power to execute a request. The Courts of the Requested State shall have authority to issue subpoenas, search warrants, or other orders necessary to execute the request.

Requests are to be executed in accordance with the laws of the Requested State unless the Treaty provides otherwise. However, the method of execution specified in the request shall be followed except insofar as it is prohibited by the laws of the Requested State.

If the Central Authority of the Requested State determines that execution of the request would interfere with an ongoing criminal investigation or proceeding, it may postpone execution or, after consultations with the Requesting State, impose conditions on such execution. If the Requesting State accepts assistance subject to such conditions, it shall comply with them.

Article 5 further requires the Requested State, if so requested, to use its best efforts to keep confidential a request and its contents,

vii

and to inform the Requesting State if the request cannot be exe-
cuted without breaching confidentiality.

Article 6 apportions between the two States the costs incurred in
executing a request. Generally, each State shall bear the expenses
incurred within its territory in executing a request.

Article 7 obliges the Requesting State not to use any information
or evidence obtained under the Treaty for purposes unrelated to
the proceedings stated in the request without prior consent of the
Requested State. If the Requested State requests that information
or evidence furnished be kept confidential, the Requesting State is
required to use its best efforts to comply with the conditions speci-
fied. Once information is made public in the Requesting State in
accordance with the Treaty, no further limitations on use apply.

Article 8 provides that the Requested State may compel, if nec-
essary, the taking of testimony or production of documents or other
evidence in its territory on behalf of the Requesting State. The arti-
cle requires the Requested State, upon request, to inform the Re-
questing State in advance of the date and place of the taking of tes-
timony.

Article 8 also requires the Requested State to permit the pres-
ence of any persons specified in the request (such as the accused,
counsel for the accused, or other interested persons) and to permit
such persons to question the person whose testimony is being taken
or, if such direct questioning is not permitted, to submit questions
to the appropriate authority. In the event that a person whose tes-
timony or evidence is being taken asserts a claim of immunity, in-
capacity, or privilege under the laws of the Requesting State, the
testimony or evidence shall be taken and the claim made known to
the Requesting State for resolution by its authorities.

Finally, Article 8 provides a mechanism for authentication of doc-
umentary evidence produced pursuant to this article and provides
that no further authentication or certification shall be necessary in
order for such information to be admissible in evidence in proceed-
ings in the Requesting State.

Article 9 requires that the Requested State provide the Request-
ing State with copies of publicly available records or information of
government departments and agencies. The Requested State may
further provide copies of other records or information in the posses-
sion of a government department or agency but not publicly avail-
able, to the same extent and under the same conditions as it would
to its own law enforcement or judicial authorities. Article 9 re-
quires authentication of documents furnished in the manner speci-
fied in the request and confirms their admissibility in evidence in
the Requesting State if so authenticated.

Article 10 provides a mechanism for the Requesting State to in-
vite the voluntary appearance and testimony in its territory of a
person located in the Requested State. The Central Authority of
the Requested State is required to invite the person to appear and
to promptly inform the Requesting State of the person's response.

Article 11 provides for the voluntary transfer to one State of a
person in custody in the other State for purposes of assistance
under the Treaty, provided that the person in question and both
States agree. The article establishes the express authority and the
obligation of the Requesting State to maintain the person trans-

viii

ferred in custody unless other wise authorized by the Requested State. If further obligates the Requesting State to return the person to the Requested State as soon as circumstances permit or as otherwise agreed by the States, without the need for extradition proceedings.

Article 12 provides that a person voluntarily appearing in the Requesting State pursuant to Article 10 or 11 shall be immune from criminal prosecution, detention, or any restriction of personal liberty, and shall not be subject to service of process while he is in the Requesting State. This "safe conduct" is limited to acts or convictions that preceded the person's departure from the Requested State. Any safe conduct provided under this article shall cease 15 days after the person's presence is no longer required in the Requesting State or whenever the person voluntarily enters that State after leaving it.

Article 13 requires the Requested State to use its best efforts to ascertain the location or identity of persons or items specified in a request.

Article 14 requires the Requested State to use its best efforts to effect service of any documents relating to or forming part of a request under the Treaty. The article further requires that, unless otherwise agreed, any request for the service of a document inviting a person to appear in the territory of the Requesting State be received by the Requested State no later than 30 days before the scheduled appearance. The Requested State is required to return proof of service.

Article 15 obligates the Requested State to execute requests for search, seizure, and delivery of any item to the Requesting State if the request includes the information justifying such action under the laws of the Requested State. The article further provides for the certification of the continuity of custody, and the identity and integrity of any such item in order to preserve its admissibility in evidence in the Requesting State. In addition, Article provides that the Central Authority of the Requested State may impose conditions on the transfer of the seized items to protect third-party interests in the property.

Article 16 obliges the Requesting State to return to the Requested State as soon as possible any documents, records, or items furnished under the Treaty if the Requested State so requests.

Article 17 provides that, if one State becomes aware of fruits or instrumentalities of offenses that are located in the territory of the other State and may be forfeitable or otherwise subject to seizure under the laws of the other State, it may so inform the other State. Article 17 also obligates the States to assist one another to the extent permitted by their respective laws in proceedings involving the forfeiture of the proceeds and instrumentalities of crime. The article further permits the States to agree to share forfeited assets, or the proceeds of their sale, to the extent permitted by their respective laws and upon such terms as they deem appropriate.

Article 18 states that assistance and procedures provided in the Treaty shall not prevent the granting of assistance under any other international convention or bilateral agreement between the two States. The article also states that the Treaty shall not prevent the

ix

granting of assistance available under the national laws of either State.

Article 19 provides that the Central Authorities of the two States shall consult, at times mutually agreed upon, concerning the most effective means to implement the provisions of the Treaty.

Article 20 provides that the Treaty shall be ratified and shall enter into force upon exchange of instruments of ratification. The article also includes a provision that allows for requests under the Treaty to be actionable even if the relevant acts or omissions occurred prior to the date the Treaty entered into force. In addition, Article 20 allows either State to terminate the Treaty with six months written notice to the other State.

In an exchange of diplomatic notes accompanying the Treaty, the two States agree to utilize one of three certificates of authenticity for business records or foreign public documents requested pursuant to the Treaty. The exchange of notes will enter into force at the same time as the Treaty.

A Technical Analysis explaining in detail the provisions of the Treaty is being prepared by the United States negotiating delegation, consisting of representatives from the Departments of Justice and State, and will be transmitted separately to the Senate Committee on Foreign Relations.

The Department of Justice joins the Department of State in recommending approval of this Treaty by the Senate as soon as possible.

Respectfully submitted,

STROBE TALBOTT.

**TREATY**
**BETWEEN**
**THE UNITED STATES OF AMERICA AND**
**THE REPUBLIC OF KOREA**
**ON MUTUAL LEGAL ASSISTANCE IN CRIMINAL MATTERS**

The Government of the United States of America and the Government of the Republic of Korea,

Desiring to improve the effectiveness of both countries in the prevention, investigation, and prosecution of crime through cooperation and mutual legal assistance in criminal matters,

Have agreed as follows:

(1)

2

- 2 -

### Article 1
### Scope of Assistance

1. The Contracting Parties shall provide mutual assistance, in accordance with the provisions of this Treaty, in connection with the prevention, investigation, and prosecution of offenses, and in proceedings related to criminal matters.

2. Assistance shall include:

    a. taking the testimony or statements of persons;

    b. providing documents, records, and articles of evidence;

    c. serving documents;

    d. locating or identifying persons or items;

    e. transferring persons in custody for testimony or other purposes;

    f. executing requests for searches and seizures;

    g. assisting in forfeiture proceedings; and

    h. any other form of assistance not prohibited by the laws of the Requested State.

3. This Treaty is intended solely for mutual legal assistance between the Contracting Parties. The provisions of this Treaty shall not give rise to a right on the part of any private person to obtain, suppress, or exclude any evidence, or to impede the execution of a request.

3

- 3 -

### Article 2
### Central Authorities

1.  Each Contracting Party shall designate a Central Authority to make and receive requests pursuant to this Treaty.

2.  For the United States of America, the Central Authority shall be the Attorney General or such persons designated by him.  For the Republic of Korea, the Central Authority shall be the Minister of Justice or such persons designated by him.

3.  For the purposes of this Treaty, the Central Authorities shall communicate directly with one another, or through the diplomatic channel.

### Article 3
### Limitations on Assistance

1.  The Central Authority of the Requested State may deny assistance if:

> a.  the request relates to a political offense or to an offense under military law which would not be an offense under ordinary criminal law;
>
> b.  there are substantial grounds leading the Central Authority of the Requested State to believe that compliance would facilitate the prosecution or punishment of the person to whom the request refers on

4

- 4 -

account of his race, religion, nationality or
political opinions;

c.  the execution of the request would prejudice the
security or similar essential interests of the
Requested State; or

d.  except as provided in paragraph 2 below, the
conduct which is the subject of the investigation,
prosecution, or proceeding in the Requesting State
would not constitute an offense under the laws of the
Requested State.

2.  The Requested State shall, with respect to the
categories of conduct described in the Annex to this Treaty,
provide assistance without regard to whether the conduct which
is the subject of the investigation, prosecution, or proceeding
in the Requesting State would constitute an offense under the
laws of the Requested State.

3.  Before denying assistance pursuant to this Article, the
Central Authority of the Requested State shall consult with the
Central Authority of the Requesting State to consider whether
assistance can be given subject to such conditions as it deems
necessary.  If the Requesting State accepts assistance subject
to these conditions, it shall comply with the conditions.

4.  If the Central Authority of the Requested State denies
assistance, it shall inform the Central Authority of the
Requesting State of the reasons for the denial.

5

- 5 -

### Article 4
### Form and Content of Requests

1.  A request for assistance shall be in writing except
that the Central Authority of the Requested State may accept a
request in another form in urgent situations.  In any such
situation, the request shall be confirmed in writing promptly
thereafter unless the Central Authority of the Requested State
agrees otherwise.  The request and any accompanying documents
shall be in the language of the Requested State unless otherwise
agreed.

2.  The request shall include the following:

a. the name of the authority conducting the
investigation, prosecution, or proceeding to which the
request relates;

b.  a description of the subject matter and the nature
of the investigation, prosecution, or proceeding,
including the specific criminal offenses which relate
to the matter;

c.  a description of the evidence, information, or
other assistance sought; and

d.  a statement of the purpose for which the evidence,
information, or other assistance is sought.

3.  To the extent necessary and possible, a request shall
also include:

6

- 6 -

a. information on the identity and location of any person from whom evidence is sought;

b. information on the identity and location of a person to be served, that person's relationship to the proceedings, and the manner in which service is to be made;

c. information on the identity and whereabouts of a person to be located;

d. a precise description of the place or person to be searched and of the items to be seized;

e. a description of the manner in which any testimony or statement is to be taken and recorded;

f. a list of questions to be asked of a witness;

g. a description of any particular procedure to be followed in executing the request;

h. information as to the allowances and expenses to which a person asked to appear in the Requesting State will be entitled; and

i. any other information which may be brought to the attention of the Requested State to facilitate its execution of the request.

Article 5

Execution of Requests

1. The Central Authority of the Requested State shall promptly execute the request or, when appropriate, transmit it

7

- 7 -

to the authority having jurisdiction to do so.  The competent
authorities of the Requested State shall do everything in their
power to execute the request.  The Courts of the Requested State
shall have authority to issue subpoenas, search warrants, or
other orders necessary to execute the request.

2.  When necessary, the request shall be presented to the
appropriate authority by the persons appointed by the Central
Authority of the Requested State.

3.  Requests shall be executed in accordance with the laws
of the Requested State except to the extent that this Treaty
provides otherwise.  However, the method of execution specified
in the request shall be followed except insofar as it is
prohibited by the laws of the Requested State.

4.  If the Central Authority of the Requested State
determines that execution of a request would interfere with an
ongoing criminal investigation or proceeding in that State, it
may postpone execution, or make execution subject to conditions
determined to be necessary after consultations with the Central
Authority of the Requesting State.  If the Requesting State
accepts the assistance subject to the conditions, it shall
comply with the conditions.

5.  The Requested State shall use its best efforts to keep
confidential a request and its contents if such confidentiality
is requested by the Central Authority of the Requesting State.
If the request cannot be executed without breaching the
requested confidentiality, the Central Authority of the

8

- 8 -

Requested State shall so inform the Central Authority of the
Requesting State, which shall then determine whether the request
should nevertheless be executed.

6.  The Central Authority of the Requested State shall
respond to reasonable inquiries by the Central Authority of the
Requesting State concerning progress toward execution of the
request.

7.  The Central Authority of the Requested State shall
promptly inform the Central Authority of the Requesting State of
the outcome of the execution of the request.  If the requested
assistance is not provided, the Central Authority of the
Requested State shall supply the reasons for this outcome to the
Central Authority of the Requesting State.

### Article 6
### Costs

The Requested State shall assume all costs relating to the
execution of the request within its territory, except for the
fees of expert witnesses, the costs of translation and
transcription, and the allowances and expenses related to travel
of persons pursuant to Articles 10 and 11, which fees,
allowances, and expenses shall be paid by the Requesting State.

9

- 9 -

### Article 7
### Limitations on Use

1.  The Requesting State shall not use any information or evidence obtained under this Treaty in any investigation, prosecution, or proceeding other than that described in the request without the prior consent of the Requested State.

2.  The Central Authority of the Requested State may request that information or evidence furnished under this Treaty be kept confidential in accordance with conditions which it shall specify. In that case, the Requesting State shall use its best efforts to comply with the conditions specified.

3.  Information or evidence which has been made public in the Requesting State in accordance with paragraph 1 or 2 may thereafter be used for any purpose.

### Article 8
### Testimony or Evidence in the Requested State

1.  A person in the Requested State from whom evidence is requested pursuant to this Treaty shall be compelled, if necessary, to appear and testify or produce any item, including documents, records, and any other articles of evidence.

2.  Upon request, the Central Authority of the Requested State shall furnish information in advance about the date and place of the taking of the testimony or evidence pursuant to this Article.

10

- 10 -

3.   The Requested State shall permit the presence of such
persons as specified in the request during the execution of the
request, and may allow such persons to question the person
whose testimony or evidence is being taken. In the event that
such direct questioning is not permitted, such persons shall be
allowed to submit questions to be posed to the persons whose
testimony or evidence is being taken.

4.   If the person referred to in paragraph 1 asserts a
claim of immunity, incapacity, or privilege under the laws of
the Requesting State, the testimony or evidence shall
nonetheless be taken and the claim made known to the Central
Authority of the Requesting State for resolution by the
authorities of that State.

5.   Documents, records, and any other articles of evidence
produced in the Requested State pursuant to this Article or
which are the subject of testimony taken under this Article
shall be certified or authenticated in accordance with
procedures specified in the request. If certified or
authenticated in such manner, they shall be admissible in
evidence as proof of the truth of the matters set forth therein
in accordance with the laws of the Requesting State.

Article 9
Records of Government Agencies

1.   The Requested State shall provide the Requesting State
with copies of publicly available documents, records, or

11

- 11 -

information in the possession of government departments and
agencies in the Requested State.

2. The Requested State may provide copies of any
documents, records, or information which are in the possession
of a government department or agency in that State but which
are not publicly available, to the same extent and under the
same conditions as it would be available to its own law
enforcement or judicial authorities. The Requested State may
in its discretion deny a request pursuant to this paragraph
entirely or in part.

3. Documents, records and copies thereof produced pursuant
to this Article shall be certified or authenticated in
accordance with the procedures specified in the request. If
certified or authenticated in such manner, they shall be
admissible in evidence as proof of the truth of the matters set
forth therein in accordance with the laws of the Requesting
State.

### Article 10
#### Testimony in the Requesting State

The Requested State shall invite a person in that State to
appear before the appropriate authority in the Requesting
State. The Requesting State shall indicate the extent to which
the expenses will be paid. The Central Authority of the
Requested State shall promptly inform the Central Authority of
the Requesting State of the person's response.

12

- 12 -

## Article 11
### Transfer of Persons in Custody

1.  A person in the custody of the Requested State whose presence in the Requesting State is needed for purposes of assistance under this Treaty shall be transferred from the Requested State for that purpose if both the person and the Central Authority of the Requested State consent to the transfer.

2.  A person in the custody of the Requesting State whose presence in the Requested State is needed for purposes of assistance under this Treaty may be transferred to the Requested State if the person consents and if the Central Authorities of both States agree.

3.  For purposes of this Article:

   a.  the receiving State shall have the authority and the obligation to keep the person transferred in custody unless otherwise authorized by the sending State;

   b.  the receiving State shall return the person transferred to the custody of the sending State as soon as circumstances permit or as otherwise agreed by both Central Authorities;

   c.  the receiving State shall not require the sending State to initiate extradition proceedings for the return of the person transferred; and

13

- 13 -

d.  the person transferred shall receive credit for
service of the sentence imposed in the sending State
for time served in the custody of the receiving State.

Article 12
Safe Conduct

1.  A person present in the Requesting State pursuant to
Articles 10 or 11 shall not be subject to service of process,
or be detained, prosecuted or subjected to any restriction of
personal liberty by reason of acts or convictions which
preceded that person's departure from the Requested State.

2.  The safe conduct provided for by this Article shall
cease fifteen days after the Central Authority of the
Requesting State has notified the Central Authority of the
Requested State that the person's presence is no longer
required, or if the person has left the Requesting State and
voluntarily returned to it.

Article 13
Location or Identification of Persons or Items

The Requested State shall use its best efforts to
ascertain the location or identity of persons or items
specified in the request and believed to be in the Requested
State.

14

- 14 -

### Article 14
### Service of Documents

1.  The Requested State shall use its best efforts to
effect service of any documents relating to or forming part of
any request for assistance made by the Requesting State under
the provisions of this Treaty.

2.  Unless otherwise agreed, any request for the service
of a document inviting the appearance of a person before an
authority in the Requesting State must be received by the
Central Authority of the Requested State not later than thirty
days before the date set for any appearance.

3.  The Requested State shall return a proof of service in
the manner specified in the request.

### Article 15
### Search and Seizure

1.  The Requested State shall execute a request for the
search, seizure, and delivery of any item, including documents,
records, or other articles of evidence, to the Requesting State
if the request includes the information justifying such action
under the laws of the Requested State.

2. Upon request, every official who has custody of a
seized article shall certify, in accordance with procedures
specified in the request, the continuity of custody, the

15

- 15 -

identity of the article, and the integrity of its condition.
Such certification shall be admissible in evidence as proof of
the truth of the matters set forth therein.

3.  The Central Authority of the Requested State may
require that the Requesting State agree to terms and conditions
deemed necessary to protect third party interests in the item
to be transferred.

## Article 16
### Return of Items

If required by the Central Authority of the Requested
State, the Central Authority of the Requesting State shall
return as soon as possible any documents, records, or articles
of evidence furnished to it in execution of a request under
this Treaty.

## Article 17
### Assistance in Forfeiture Proceedings

1.  If the Central Authority of one Contracting Party
becomes aware of fruits or instrumentalities of offenses which
are located in the territory of the other Contracting Party and
may be forfeitable or otherwise subject to seizure under the
laws of that Contracting Party, it may so inform the Central
Authority of the other Contracting Party.  If that other

16

- 16 -

Contracting Party has jurisdiction in this regard, it may
present this information to its authorities for a determination
as to whether any action is appropriate. These authorities
shall issue their decision in accordance with the laws of their
country, and shall, through their Central Authority, report to
the other Contracting Party on the action taken.

2.  The Contracting Parties shall assist each other to the
extent permitted by their respective laws in proceedings
relating to the forfeiture of the fruits and instrumentalities
of offenses. This may include action to restrain temporarily
the disposition of the fruits or instrumentalities of offenses
pending further proceedings.

3.  A Requested State in control of forfeited proceeds or
instrumentalities shall dispose of them in accordance with its
law.  To the extent permitted by its laws and upon such terms
as it deems appropriate, either Contracting Party may transfer
forfeited assets or the proceeds of their sale to the other
Contracting Party.

Article 18
Compatibility with Other Treaties,
Agreements or Arrangements

Assistance and procedures set forth in this Treaty shall
not prevent either Contracting Party from granting assistance
to the other Contracting Party through the provisions of other
international agreements to which it may be a party, or through

17

- 17 -

the provisions of its national laws.  The Contracting Parties
may also provide assistance pursuant to any bilateral
agreement, arrangement, or practice which may be applicable.

### Article 19
### Consultation

The Central Authorities of the Contracting Parties shall
consult, at times mutually agreed to by them, to enable the
most effective use to be made of this Treaty.

### Article 20
### Ratification, Entry into Force, and
### Termination

1.  This Treaty shall be subject to ratification, and the
instruments of ratification shall be exchanged at Washington as
soon as possible.

2.  This Treaty shall enter into force upon the exchange
of instruments of ratification.

3.  This Treaty shall apply to any requests presented
after its entry into force even if the relevant acts or
omissions occurred before that date.

4.  Either Contracting Party may terminate this Treaty by
means of written notice to the other Contracting Party.
Termination shall take effect six months following the date of
notification.

18

- 18 -

IN WITNESS WHEREOF, the undersigned, being duly authorized by their respective Governments, have signed this Treaty.


DONE at Washington this twenty-third day of November 1993, in duplicate, in the English and Korean languages, both texts being equally authentic.

FOR THE UNITED STATES OF AMERICA        FOR THE REPUBLIC OF KOREA

19

- 19 -

ANNEX

Both Contracting Parties agree to provide assistance in investigations, prosecutions, and proceedings concerning the following categories of conduct without regard to whether the conduct which is the subject of the investigation, prosecution or proceeding would constitute an offense under the laws of the Requested State:

1. Illicit traffic in narcotic drugs and psychotropic substances, including but not limited to all offenses connected with, arising from, related to or resulting from any narcotics activity described in the 1961 Single Convention on Narcotic Drugs, the 1971 Convention on Psychotropic Substances, the 1972 Protocol Amending the Single Convention, or the 1988 United Nations Convention Against the Illicit Traffic in Narcotic Drugs and Psychotropic Substances;

2. Racketeering activity, including, in the case of a request from the United States: (a) using income derived from a pattern of criminal activity to establish, operate, or acquire an interest in an enterprise engaged in or affecting interstate commerce; (b) acquiring or maintaining control of or an interest in such an enterprise through a pattern of criminal activity or collection of illegal debt; or (c) conducting or participating in the conduct of such an enterprise's affairs through a pattern of criminal activity or collection of unlawful debt; or, in the case of

20

- 20 -

a request from Korea, organizing or joining a group the
purpose of which is the commission of a crime;
3. Money laundering, including (a) failing to make or
causing another to fail to make to the Government a report
which is required by law to be made in respect of a
transfer of currency or other financial transaction; (b)
converting, transferring, or receiving property knowing
that such property is derived from a criminal offense, for
the purpose of concealing or disguising the illicit origin
of such property or of assisting any person involved in the
commission of such offense to evade the legal consequences
of his actions; or (c) concealing or disguising the true
nature, source, location, disposition, or movement or
ownership of property knowing that such property is derived
from a criminal offense;

4. Any violent criminal activity described in the
Convention for the Suppression of Unlawful Seizure of
Aircraft (Hijacking) done at the Hague December 16, 1970;
the Convention on Offenses and Certain Other Acts Committed
on Board Aircraft, done at Tokyo September 14, 1963; the
Convention for the Suppression of Unlawful Acts against the
Safety of Civil Aircraft (Sabotage), done at Montreal
September 23, 1971; the Convention on the Prevention and
Punishment of Crimes against Internationally Protected
Persons, including Diplomatic Agents, done at New York
December 14, 1973; the International Convention Against the

21

- 21 -

Taking of Hostages, done at New York December 17, 1979; or
in any other treaty or convention to which both States are
parties and the purpose of which is to prevent or repress a
specific category of offenses and which imposes an
obligation to either extradite the offender or submit the
matter to the competent authorities for decision as to
prosecution;

5. Offense relating to the willful issuance of a bad
(illicit) check, including the issuance of a check under a
false name or without having made arrangements with a
financial institution, or after transactions have been
suspended by such an institution; and the willful failure
to honor the check;

6. Fraud against the Government or against individuals,
including behavior which has the effect of depriving the
Government, its agencies, or its citizens of money,
valuable property, or the ability to conduct their affairs
free from false statements and deceit;

7. Fraudulent securities practices, including the use by
any person of any means, directly or indirectly, in
connection with the offer, purchase, or sale of any
security: (a) to employ any device, scheme, or artifice to
defraud; (b) to willfully make any misleading statement; or
(c) to willfully engage in any act, practice, or course of
business which operates or would operate as a fraud or
deceit upon any person;

22

- 22 -

8. Insider trading, including the offer, purchase, or sale
of securities by any person while in possession of material
non-public information directly or indirectly relating to
the securities offered, purchased, or sold, in breach of a
legally binding duty or trust or confidence;

9. Foreign Corrupt Practices, including the corrupt
offering, paying, or making of inducements to any foreign
official or foreign political party, official thereof, or
candidate for foreign political office to assist such
person in obtaining or retaining business for himself or in
directing business to any other person;

10. Tax evasion or fiscal fraud, including making a false
statement, whether written or oral, or intentionally
failing to make a report or declaration as required by law,
to government authorities in matters concerning customs
duties or taxes;

11. Environmental crimes, including conduct directed at the
destruction, defacing, deterioration, or harming of the
earth's environment;

12. Export control offenses, including conduct tending to
evade the laws controlling the export of goods or arms;

13. Criminal exploitation of children, whether for sexual
or other purposes, including commercial dealing in child
pornography;

14. Offenses against bankruptcy laws;

15. Offenses against the laws relating to corporations or

23

- 23 -

companies, including offenses committed by officers,
directors, and promoters;

16. Any offense against the laws relating to firearms,
weapons, or explosives of any type;

17. Offenses against the laws relating to protection of
intellectual property, copyrights, patents, or trademarks;

18. Offenses against the laws relating to immigration and
nationality (including fraudulent acquisition or use of a
passport or visa) and alien smuggling;

19. Offenses against the laws relating to the control of
exportation or importation of goods of any type, or the
international transfer of funds;

20. Offenses against the laws relating to prohibition of
private monopolies or unfair business transactions or
practices;

21. Offenses against the laws relating to the protection of
computers or computer systems, computer data, or computer
security (to include passwords or other related devices);

22. Offenses under multilateral international conventions
binding on both Parties for which offenders must be
prosecuted or extradited;

23. Any offense derived from conduct described in this
Annex or subject to mutual assistance in accordance with
this Treaty where United States federal jurisdiction is
based upon interstate transport or use of the mails,
telecommunications, or other interstate facilities;

24

- 24 -

24. Any attempt or conspiracy to commit, aiding or
abetting, or participation as accessory after the fact to
any offense derived from conduct described in this Annex or
subject to mutual assistance in accordance with this Treaty;

25. Any offense under the law in the Requesting State which
is connected with the commission of one or more offenses
derived from the conduct described in this Annex or subject
to mutual assistance in accordance with this Treaty; or

26. Such further offenses as may from time to time be
agreed upon by exchange of diplomatic notes between the
Contracting Parties.

25

DEPARTMENT OF STATE
WASHINGTON
November 23, 1993

Excellency,

I have the honor to refer to the Mutual Legal
Assistance Treaty Between the United States of
America and the Republic of Korea, signed at
Washington on November 23, 1993, and in particular to
express the understanding of the Government of the
United States of America with respect to Articles
8(5) and 9(3) of the Treaty.

These two provisions state that evidence
obtained under the Treaty should be authenticated in
accordance with the procedures specified in the
request, and if certified or authenticated in this
manner, the evidence shall be admissible in evidence
as proof of the matters stated therein in accordance
with the laws of Requesting State.

During the course of the negotiations, each side
achieved a greater understanding and appreciation of
the legal principles that are generally applied by
the courts of the other in deciding issues dealing

His Excellency

Han Sung-Joo,

Minister of Foreign Affairs,

Republic of Korea.

26

- 2 -

with the admission into evidence of various types of
records made or maintained in the course of a
regularly conducted business activity or by an
official government agency in reference to matters
entrusted to it by law.

Taking appropriate account of the applicable
domestic laws of both Contracting Parties as to
admissibility of such documentary evidence, and
recognizing that the establishment of uniform
procedures for certifying or authenticating evidence
that has been secured under the Treaty will enhance
the likelihood that such evidence will ultimately be
accepted by the courts, representatives of the Korean
Ministry of Justice and United States Department of
Justice who participated in the negotiation of the
Treaty have jointly developed three certificate forms
which are attached to this Note.

United States requests for copies of business
records under Article 8(5) of the Treaty will be
authenticated by use of the Certificate of
Authenticity of Business Records attached to this
Note as Form A-1.  Similarly, Korean requests for
copies of business records will be authenticated by
use of the Certificate of Authenticity of Business
Records attached to this Note as Form A-2.  Requests
for copies of foreign public documents by either
party will be authenticated under Article 9(3) by use

27

- 3 -

of the form entitled Attestation of Authenticity of
Foreign Public Documents, attached to this Note as
Form B.

I would appreciate a Note from Your Excellency
confirming that the understanding described above is
also the understanding of the Government of the
Republic of Korea.  If that is the case, this Note
and Your Excellency's reply will constitute an
agreement between our respective Governments on this
matter, which shall enter into force at the same time
the Treaty enters into force.

Accept, Excellency, the assurances of my highest
consideration.

Warren Christopher

Attachments:

    1 - Form A-1

    2 - Form A-2

    3 - Form B

28

FORM A-1

(For United States Requests)

CERTIFICATE OF AUTHENTICITY OF

BUSINESS RECORDS

I, _____, attest on

(name)

penalty of criminal punishment for false statement or
false attestation that I am employed

by _____

(Name of Business from which documents are sought)

and that my official title is _____.

I further state that each of the records attached
hereto is the original or a duplicate of the original
records in the custody of

_____

(Name of Business from which documents are sought)

I further state:

        A)    such records were made, at or near
the time of the occurrence of the matters set forth,
by (or from information transmitted by) a person with
knowledge of these matters;

        B)    such records were kept in the course
of a regularly conducted business activity;

        C)    the business activity made such
records as a regular practice; and

        D)    if such record is not the original,

29

- 2 -

such record is a duplicate of the original.

_____        _____
            Signature                          Date

        Sworn to or affirmed before

me, _____.
            (Name)

a _____

    (position of person authorized to administer oaths)

this _____day of _____, _____.

                    _____
                              (Signature)

30

**FORM A-2**

**(For Korean Requests)**

**CERTIFICATE OF AUTHENTICITY OF**

**BUSINESS RECORDS**

I, _____, attest on

(name)

penalty of criminal punishment for false statement or

false attestation that I am employed

by _____ and that my official

title is _____.

I further state that each of the documents or records

attached hereto is the original or a duplicate of the

original documents or records in the custody of

_____

(Name of Business from which documents are sought)

I further state that such documents or records were

made, at or near the time of the occurrence of the

matters set forth, by (or from information

transmitted by) a person with knowledge of those

matters and that if such document or record is not

the original, such document or record is a duplicate

of the original.

_____        _____

Signature                                        Date

Sworn to or affirmed before

me, _____,

(Name)

31

- 2 -

a _____
    (notary public, judicial officer, etc.)

this _____ day of _____. ____.

                _____
                      (Signature)

32

## FORM B

### ATTESTATION OF AUTHENTICITY OF
### FOREIGN PUBLIC DOCUMENTS

I, _____,

(name)

attest on penalty of criminal punishment for false

statement or attestation that my position with the

Government of _____

(country)

is _____ and that

(official title)

in that position I am authorized by the law

of _____ to attest that

(country)

the documents attached and described below are true

and accurate copies of original official records

which are recorded or filed

in _____

(Name of office or Agency)

which is a government office or agency

of _____.

(Country)

Description of Document(s):

_____

(Signature)

_____

(Title)

_____

(Date)

33

November 23, 1993

Excellency,

I have the honor to acknowledge the receipt of
Your Note dated November 23, 1993 which reads as
follows:

"Excellency,

I have the honor to refer to the Mutual Legal
Assistance Treaty Between the United States of
America and the Republic of Korea, signed at
Washington on November 23, 1993, and in particular to
express the understanding of the Government of the
United States of America with respect to Articles
8(5) and 9(3) of the Treaty.

These two provisions state that evidence obtained
under the Treaty should be authenticated in
accordance with the procedures specified in the
request, and if certified or authenticated in this
manner, the evidence shall be admissible in evidence
as proof of the matters stated therein in accordance
with the laws of Requesting State.

During the course of the negotiations, each side
achieved a greater understanding and appreciation of
the legal principles that are generally applied by
the courts of the other in deciding issues dealing

His·Excellency
    Warren Christopher,
        Secretary of State,
            United States of America.

34

- 2 -

with the admission into evidence of various types of
records made or maintained in the course of a
regularly conducted business activity or by an
official government agency in reference to matters
entrusted to it by law.

Taking appropriate account of the applicable
domestic laws of both Contracting Parties as to
admissibility of such documentary evidence, and
recognizing that the establishment of uniform
procedures for certifying or authenticating evidence
that has been secured under the Treaty will enhance
the likelihood that such evidence will ultimately be
accepted by the courts, representatives of the Korean
Ministry of Justice and United States Department of
Justice who participated in the negotiation of the
Treaty have jointly developed three certificate forms
which are attached to this Note.

United States requests for copies of business
records under Article 8(5) of the Treaty will be
authenticated by use of the Certificate of
Authenticity of Business Records attached to this
Note as Form A-1. Similarly, Korean requests for
copies of business records will be authenticated by
use of the Certificate of Authenticity of Business
Records attached to this Note as Form A-2. Requests
for copies of foreign public documents by either
party will be authenticated under Article 9(3) by use

35

- 3 -

of the form entitled Attestation of Authenticity of Foreign Public Documents, attached to this Note as Form B.

I would appreciate a Note from Your Excellency confirming that the understanding described above is also the understanding of the Government of the Republic of Korea. If that is the case, this Note and Your Excellency's reply will constitute an agreement between our respective Governments on this matter, which shall enter into force at the same time the Treaty enters into force.

Accept, Excellency, the assurances of my highest consideration.


Attachments:

    1 - Form A-1
    2 - Form A-2
    3 - Form B

36

## FORM A-1

### (For United States Requests)
### CERTIFICATE OF AUTHENTICITY OF
### BUSINESS RECORDS

I, _____, attest on

(name)

penalty of criminal punishment for false statement or
false attestation that I am employed

by _____

(Name of Business from which documents are sought)
and that my official title is _____.
I further state that each of the records attached
hereto is the original or a duplicate of the original
records in the custody of

_____

(Name of Business from which documents are sought)
I further state:

A)    such records were made, at or near
the time of the occurrence of the matters set forth,
by (or from information transmitted by) a person with
knowledge of these matters;

B)    such records were kept in the course
of a regularly conducted business activity;

C)    the business activity made such
records as a regular practice; and

D)    if such record is not the original,

37

- 2 -

such record is a duplicate of the original.

_____    _____
            Signature                         Date

        Sworn to or affirmed before

me, _____.
            (Name)

a _____

    (position of person authorized to administer oaths)

this _____ day of _____, _____.

                        _____
                                    (Signature)

  


38

**FORM A-2**

(For Korean Requests)

**CERTIFICATE OF AUTHENTICITY OF**

**BUSINESS RECORDS**

I, _____, attest on

            (name)

penalty of criminal punishment for false statement or

false attestation that I am employed

by _____ and that my official

title is _____.

I further state that each of the documents or records

attached hereto is the original or a duplicate of the

original documents or records in the custody of

_____

(Name of Business from which documents are sought)

I further state that such documents or records were

made, at or near the time of the occurrence of the

matters set forth, by (or from information

transmitted by) a person with knowledge of those

matters and that if such document or record is not

the original, such document or record is a duplicate

of the original.

_____      _____

       Signature              Date

       Sworn to or affirmed before

me, _____,

           (Name)

39

- 2 -

a _____

   (notary public, judicial officer, etc.)

this _____ day of _____, _____.

                _____

                      (Signature)

40

**FORM B**

**ATTESTATION OF AUTHENTICITY OF**

**FOREIGN PUBLIC DOCUMENTS**

I, _____,

(name)

attest on penalty of criminal punishment for false

statement or attestation that my position with the

Government of _____

(country)

is _____ and that

(official title)

in that position I am authorized by the law

of _____ to attest that

(country)

the documents attached and described below are true

and accurate copies of original official records

which are recorded or filed

in _____

(Name of office or Agency)

which is a government office or agency

of _____.

(Country)

Description of Document(s):

_____

(Signature)

_____

(Title)

_____

(Date)

41

- 4 -

I have the honor to confirm that the
understanding set forth in your Note accords with
that of the Government of the Republic of Korea.

I avail myself of this opportunity to renew to
Your Excellency the assurances of my highest
consideration.

Han Sung-Joo
Minister of Foreign Affairs
Republic of Korea