UNITED STATES DISTRICT COURT
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES  DISTRICT COURT

## Northern District of California

### San Francisco Division

| | |
|---|---|
| In the Matter of the Application of | No. C 13-80125 CRB (LB) |
| O2CNI CO., LTD., | **ORDER DENYING O2CNI'S APPLICATION FOR DISCOVERY** |
| For an Order to Conduct Discovery for Use in a Foreign Legal Proceeding pursuant to 28 U.S.C. § 1782. | [Re: ECF Nos. 1] |
| _____/ | |

## INTRODUCTION

Petitioner O2CNI Co., Ltd. filed an *ex parte* application under 28 U.S.C. § 1782 for an order to conduct discovery for use in a foreign legal proceeding (the "Application").  *See* ECF No. 1.  It seeks discovery from Symantec Corporation and its employee Steven James Owyang (collectively, "Respondents") for use in criminal proceedings in Korea and in anticipated civil litigation in Japan. *See id.*  On June 18, 2013, the district court referred the application (and all other discovery) to the undersigned for resolution.  Order of Reference, ECF No. 8; Notice of Referral, ECF No. 11. Respondents learned of O2CNI's Application (thus making it no longer ex parte) and filed an opposition.  Opposition, ECF No. 20.  The court heard oral argument from the parties on August 15, 2013, and on this record exercises its discretion to deny O2CNI's Application without prejudice.

## STATEMENT

### I. THE PARTIES AND THEIR PRIOR BUSINESS RELATIONSHIP

O2CNI (formerly known as PC Doctor) is a corporation duly organized and existing under the

laws of the Republic of Korea with its headquarters in Seoul, Korea. Shin Declaration, ECF No. 5 ¶ 2. It is a leading global developer and provider of remote technical support services, which involve troubleshooting technical problems with a customer's computer remotely without requiring an actual visit by a technician. *Id.* ¶ 5. Through its Application, O2CNI seeks documents and testimony from Symantec Corporation and Mr. Owyang for use in criminal proceedings in Korea and in anticipated civil litigation in Japan, both of which are described in more detail below. *See generally* Application, ECF No. 1. Symantec Corporation is a corporation organized under the laws of Delaware that conducts business and maintains its principal executive office in Mountain View, California. Shin Declaration, ECF No. 5 ¶ 3. Mr. Owyang is an individual who works for Symantec Corporation in Mountain View, California and resides in San Jose, California. *Id.* ¶ 4.

In 2004, in partnership with Korean internet service provider Hanaro Telecom, Inc., O2CNI launched and operated the world's first profitable remote technical support service. *Id.* ¶ 7. According to O2CNI, it used a unique communications network that substantially lowered communication fees and also employed a detailed customer relation management knowledge base that O2CNI and its affiliate Rsupport Co., Ltd. had systematically compiled over the course of the previous three years. *Id.* It states that its unique communications network and knowledge base are the keys to the profitability, quality and sustainability of its business, and so it has kept details of these vital trade secrets strictly confidential. *Id.* ¶ 8.

In 2005, O2CNI was approached by Symantec Corporation, a leading international security service provider that sells internet security and anti-virus products under the "Norton" brand name through its regional subsidiaries, to provide technical support services to its customers. *Id.* ¶ 9; Chapman Declaration, ECF No. 21 ¶ 2 (describing Symantec's business). O2CNI and several of Symantec's subsidiaries—including its Korean subsidiary ("Symantec Korea"), its Irish subsidiary ("Symantec Limited"), its Japanese subsidiary ("Symantec Japan"), and its Asia Pacific subsidiary ("Symantec Asia Pacific")—whereby O2CNI provided remote technical support services to certain Norton users located in Korea and Japan. Shin Declaration, ECF No. 5 ¶¶ 9-12; Chapman Declaration, ECF No. 21 ¶¶ 4-6, Exhs. A, B, C. O2CNI provided its services via its call center in Korea where it employed both Korean and Japanese employees to service customers in both

UNITED STATES DISTRICT COURT
For the Northern District of California

countries.  Shin Declaration, ECF No. 5 ¶ 11.  O2CNI states that, due to its proprietary communications network, calls from Japanese customers were billed at local Korean rates, thereby keeping rates low.  *Id.* ¶ 11.  O2CNI also states that it created a modified knowledge base that was tailored to the Japanese customers.  *Id.*  Thus, the communications network and knowledge base, O2CNI claims, continued to be O2CNI's essential trade secrets.  *Id.*

O2CNI's Application is related to the move of certain of its employees to Symantec Korea. Between October 2011 and December 2011, five of its key employees—namely, Young-Oh Yeom, Yong Sok Song and Dae Yeol Kim (described by O2CNI as core employees with full knowledge of O2CNI's trade secrets) and Yong Ho Ro and Sung Kyung Kim (who oversaw the Japanese operation) (collectively, the "Former Employees")—resigned for various reasons.  *Id.* ¶ 14. Immediately after leaving O2CNI, however, each of the Former Employees was hired by Symantec Korea.  *Id.* ¶ 15.  Despite Symantec Korea's assurances that the Former Employees' work is unrelated to their previous duties at O2CNI, O2CNI states that it has learned that the Former Employees actually manage a call center in Korea that provides remote technical support services in direct competition with O2CNI.  *Id.* ¶¶ 14-16.  O2CNI also states that it also learned that, in the one and a half years prior to their departure, Young-Oh Yeom, Sung Kyung Kim, and Yong Ho Ro engaged in "unusually frequent" email exchanges with Mr. Owyang and his superior Kevin Paul Chapman.  *Id.* ¶ 17.  Many of these communications apparently were made without copying O2CNI executives, in violation of O2CNI's internal reporting procedures.  *Id.*  Although several of the Former Employees attempted to destroy their emails and computer files prior to resigning, O2CNI has recovered a number of emails suggesting that some or all of the Former Employees disclosed confidential O2CNI trade secrets to Mr. Owyang, Mr. Chapman, and other Symantec personnel while still working for O2CNI.  *Id.* ¶ 18.

On July 27, 2012—less than one year after the Former Employees left O2CNI for Symantec Korea—O2CNI learned that its contract with Symantec Japan would not be renewed upon its expiration on August 31, 2012.  *Id.* ¶¶ 19-20.  After the contract expired, Symantec immediately began providing the very same remote technical support services to certain Japanese customers that O2CNI had provided, and Symantec did so from its own call center in Korea, which now was being

managed by Young-Oh Yeom and other Former Employees. *Id.* ¶ 20.  O2CNI then was informed that effective December 31, 2012, all other contracts related to Japan also would be terminated. *Id.* ¶ 21.  Since then, O2CNI has completely lost its market share in Japan. *Id.* ¶ 22.

## II.  THE KOREAN CRIMINAL PROCEEDINGS

In December 2011, O2CNI submitted a request for investigation to the Korean National Intelligence Service ("NIS") alleging that the five Former Employees illegally disclosed O2CNI's trade secrets to Symantec. *Id.* ¶ 24, Exh. A; Hwang Declaration, ECF No. 20-3 ¶ 2.  The NIS apparently conducted a preliminary review of the file and turned the matter over to the Gyeonggi Provincial Police Agency, which initiated a criminal investigation in February/March 2012 (the "Korean Criminal Proceedings").  Shin Declaration, ECF No. 5 ¶ 25; Hwang Declaration, ECF No. 20-3 ¶ 2.  As part of the investigation, Korean authorities have requested O2CNI's assistance in collecting evidence in aid of the investigation.  Shin Declaration, ECF No. 5 ¶ 26.  O2CNI states that it has cooperated fully with these requests and has provided witness testimony and documents to them. *Id.* ¶ 26.  On March 15, 2012, Korean authorities executed search and seizure warrants on Symantec Korea and each of the Former Employees located in Korea. *Id.* ¶ 27; Hwang Declaration, ECF No. 20-3 ¶ 3.  According to one of Symantec's attorneys, the authorities seized the personal computers, storage media, and both work and personal email accounts of the Former Employees at their offices and residences, and also seized extensive computer media and documents from Symantec's Korea office.  Hwang Declaration, ECF No. 20-3 ¶ 3.  The authorities also have questioned each of the Former Employees numerous times. *Id.*

The Korean police, however, apparently have informed O2CNI that despite their efforts to do so—the Korean police have sent formal "Requests to Appear" to Mr. Owyang, Mr. Chapman, and the CEOs of Symantec Corporation, Symantec Japan, and Symantec Asia Pacific—they have been unable to (a) collect any documents from Symantec Corporation that are stored or held outside Korea, or (b) interview or collect documents from Mr. Owyang or Mr. Chapman because they are outside Korea.  Shin Declaration, ECF No. 5 ¶ 28; Park Reply Declaration, ECF No. 31 ¶ 3.  Indeed, although the Korean police requested the voluntary interviews of non-Korean Symantec employees, those individuals have declined to travel to Korea to appear.  Hwang Declaration, ECF

UNITED STATES DISTRICT COURT
For the Northern District of California

No. 20-3 ¶ 8.  As far as Symantec's attorney knows, the Korean authorities have not submitted, pursuant to the applicable Treaty of Mutual Legal Assistance in Criminal Matters ("MLAT"), a request to the United States for the collection of evidence for use the Korean Criminal Proceedings. *Id.* ¶ 9.

In October and November 2012, in support of the Korean Criminal Proceedings, O2CNI submitted a complaint, request for punishment, and concurring opinion, alleging and providing further evidence that the Former Employees, Mr. Owyang, Mr. Chapman, and three Symantec entities (Symantec Corporation, Symantec Korea, and Symantec Asia Pacific PTE Limited ("Symantec Asia Pacific")) violated the Korean Unfair Competition Prevention and Trade Secret Protection Act and wrongfully acquired, used, and disclosed O2CNI's trade secrets.  Shin Declaration, ECF No. 5 ¶ 29, Exhs. B, C, D; Son Declaration, ECF No. 4 ¶ 3.  The Korean police then apparently submitted O2CNI's complaint, the evidence and testimony it had collected, and a recommendation of indictment to the Korean Public Prosecutor's Office.  Shin Declaration, ECF No. 5 ¶ 30.  O2CNI says that the Korean Public Prosecutor's Office is continuing to collect documents and evidence pursuant to its investigative powers in preparation for filing a formal indictment against the Former Employees, Mr. Owyang, Mr. Chapman, and the Symantec entities.  *Id.* ¶ 31; Son Declaration, ECF No. 4 ¶ 4.  Symantec, however, says that the Korean Public Prosecutor's Office is nearing the conclusion of its investigation, does not intend to obtain additional evidence, and will render a decision on whether to seek an indictment in the near future.  Hwang Declaration, ECF No. 20-3 ¶ 11.

**III.  THE JAPANESE CIVIL PROCEEDINGS**

According to O2CNI, the above-described events also support causes of action for violation of Japan's Unfair Competition Prevention Act and breach of the agreement between O2CNI and Symantec Japan.  Tosaki Declaration, ECF No. 3 ¶ 3.  Based on the facts of which it is aware, O2CNI states that it anticipates that it will commence a lawsuit against Symantec Korea, Symantec Japan, and/or Symantec Corporation (but not Mr. Owyang) before the commercial courts in Japan (the "Japanese Civil Proceedings").  Shin Declaration, ECF No. 5 ¶ 33 (listing only entities as defendants); *see also* Reply, ECF No. 26 at 10.  O2CNI already has filed in Tokyo District Court a

motion for a preliminary injunction restraining Symantec Corporation, Symantec Japan, Symantec Korea, and Symantec Asia Pacific from infringing O2CNI's trade secrets. Tosaki Reply Declaration, ECF No. 30 ¶ 8. The purpose of the motion for a preliminary injunction is to prevent the further alleged misappropriation and use of O2CNI's trade secrets pending the filing and litigation of O2CNI's lawsuit against Symantec Corporation, Symantec Japan, Symantec Korea, and Symantec Asia Pacific. *Id.* ¶ 8.

## IV. THE DOCUMENT REQUESTS

The Application has 17 document requests to Symantec Corporation that are summarized in the next chart. *See* Application, ECF No. 1, Ex. A at 11-17.

| Request # | Description |
|---|---|
| 1 | Policies and procedures regarding document retention or destruction policies and procedures (informal or formal) from January 1, 2007 to the present. |
| 2 | Corporate structure and personnel (including organizational charts) from January 1, 2007 for 21 divisions (such as Telesales, Norton Startup Services, and Virus and Software Solution). |
| 3 | Personnel information and job descriptions for Mr. Owyang and Mr. Chapman. |
| 4 | Comprehensive documents about the hiring of the Former Employees and their employment status. |
| 5 | "All documents and things written, created, produced, sent, or delivered by each of the Former O2CNI employees from January 2009 to the present." |
| 6 | All documents regarding Project Red |
| 7 | All documents that include the term "Project Red" including those that also include 11 additional terms. |
| 8 | All documents and things uploaded to network folders or document repositories concerning Project Red. |
| 9 | "All documents and things that have ever been received, sent, created, revised, or kept by" 27 specific employees concerning Project Red. |
| 10 | All documents or things concerning ROI project. |
| 11 | All documents and things concerning "IR People" from January 1, 2011 to the present, including "documents Symantec has ever sent or received from IR People, all State of Work documents exchanged with IR People, documents concerning Symantec's retention of IR people, decision to retain IR People, and the amount of Symantec's consulting fee payments to IR People, and invoices Symantec received from IR People. |

UNITED STATES DISTRICT COURT
For the Northern District of California

| 12 | Documents and things to show the technical specifications and architectures of the systems used to provide 18 identified services and all products and services out of Symantec's Korea call center from January 1, 2009 to the present. |
|----|----|
| 13 | Documents showing the contents of the technical support materials used by call center employees to provide the same services as in 12 from January 1, 2009 to the present. |
| 14 | Regarding the same services, documents and things relating to planning, researching, developing, improving, commercializing, and launching the services from January 1, 1009 to the present. |
| 15 | All documents and things relating to the CRM of Salesforce.com |
| 16 | Documents to show the revenue, profits, and losses from January 1, 2009 to the present for the same services. |
| 17 | All document and things concerning the Korean Criminal Investigation, including documents about Symantec's and Mr. Owyang's decision to decline to respond to investigative demands by the Korean authorities and any investigation commissioned by Symantec. |

O2CNI describes the relevance of the requests as follows. *See* Memo, ECF No. 2 at 23-24.

| Request # | O2NCI's Description of Relevance and Utility |
|-----------|----------------------------------------------|
| 1, 17 | Symantec's document retention and Symantec's and Mr. Owyang's alleged non-responsiveness to the Korean authorities' investigative demands. Relevant to determining whether Symantec and Mr. Owyang have concealed their wrongdoing by purging relevant documents or transferring information to servers outside of Korea. |
| 2 | Identification of Symantec employees with knowledge of wrongful disclosures and appropriation of O2NCI's trade secrets in order to compete unfairly. |
| 3 | Whereabouts of Mr. Owyang (in case he tries to evade service) and Mr. Chapman (to obtain discovery from him individually). |
| 4 | Relevant to wrongful solicitation and retention of the Former Employees by Symantec in order to compete unfairly wit O2NCI. |
| 5-11 | Communications with Former Employees and the transmission of O2CNI's confidential information and trade secrets to Symantec relating to the ROI Project, Project Red, and IR people, which are words that O2NCI discovered in other communications regarding disclosure of its confidential information and trade secrets. |
| 12-16 | Relevant to Symantec's use of O2CNI's trade secrets and confidential information. |

///

///

///

C 13-80125 CRB (LB)
ORDER

7

1    ///

2

3                                   **ANALYSIS**

4    **I. LEGAL STANDARD**

5        28 U.S.C. § 1782(a) provides, in pertinent part:

6            The district court of the district in which a person resides or is found may order him
             to give his testimony or statement or to produce a document or other thing for use in a
7            proceeding in a foreign or international tribunal, including criminal investigations
             conducted before formal accusation.  The order may be made pursuant to a letter
8            rogatory issued, or request made, by a foreign or international tribunal or upon the
             application of any interested person and may direct that the testimony or statement be
9            given, or the document or other thing be produced, before a person appointed by the
             court.

10

11   Among others who "possess[] a reasonable interest in obtaining [judicial] assistance," a complainant

12   who "triggers" an investigation by a state investigative body or a litigant in a foreign action qualifies

13   as an "interested person" under § 1782. *See Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S.

14   241, 256 ( 2004).  To apply for discovery pursuant to § 1782, a formal proceeding in the foreign

15   jurisdiction need not be currently pending, or even imminent. *Id*. at 258-59.  Instead, all that is

16   necessary is that a "dispositive ruling" by the foreign adjudicative body is "within reasonable

17   contemplation." *Id*. at 259 (holding that discovery was proper under § 1782 even though the

18   applicant's complaint against the opposing party was only in the investigative stage).  An *ex parte*

19   application is an acceptable method for seeking discovery pursuant to § 1782. *See In re Letters*

20   *Rogatory from Tokyo Dist., Tokyo, Japan*, 539 F.2d 1216, 1219 (9th Cir. 1976) (holding that the

21   subpoenaed parties may raise objections and exercise their due process rights by bringing motions to

22   quash the subpoenas).

23       A district court has wide discretion to grant or deny discovery under § 1782. *Intel*, 542 U.S. at

24   260-61, 264-65.  In exercising its discretion, a district court should consider the following factors:

25   (1) whether the "person from whom discovery is sought is a participant in the foreign proceeding";

26   (2) "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the

27   receptivity of the foreign government or the court or agency abroad to U.S. federal court judicial

28   assistance"; (3) whether the request "conceals an attempt to circumvent foreign proof-gathering

UNITED STATES DISTRICT COURT
For the Northern District of California

1  restrictions or other policies of a foreign country or the United States"; and (4) whether the request

2  is "unduly intrusive or burdensome." *See id.* at 264-65.

3      A district court's discretion is to be exercised in view of the twin aims of § 1782: providing

4  efficient assistance to participants in international litigation, and encouraging foreign countries by

5  example to provide similar assistance to our courts. *See Schmitz v. Bernstein Liebhard & Lifshitz,*

6  *LLP*, 376 F.3d 79, 84 (2004). There is no requirement that the party seeking discovery establish that

7  the information sought would be discoverable under the governing law in the foreign proceeding or

8  that United States law would allow discovery in an analogous domestic proceeding. *See Intel*, 542

9  U.S. at 247, 261-63.

10  **II. APPLICATION**

11     When considering an application for discovery pursuant to 28 U.S.C. § 1782, the court considers

12  first whether it has the authority to grant the request and then whether it should exercise its

13  discretion to do so. *Lazaridis v. Int'l Centre for Missing and Exploited Children, Inc.*, 760 F. Supp.

14  2d 109, 112 (D.D.C. 2011) (citations omitted).

15     **A. The Statutory Requirements Are Met**

16     Upon review of O2CNI's Application, the court finds that O2CNI made a sufficient showing,

17  with respect to both the Korean Criminal Proceedings and the Japanese Civil Proceedings, that the

18  statutory requirements for the court to issue an order pursuant to 28 U.S.C. § 1782 are met, *see*

19  Memo, ECF No. 2 at 15-19, and Respondents concede as much, Opposition, ECF No. 20 at 10

20  ("Symantec does not contest that O2CNI's application satisfies the statutory requirements under 28

21  U.S.C. § 1782"). Symantec Corporation and Mr. Owyang both are found in this District, the

22  discovery sought is "for use" in the Korean Criminal Proceedings and the Japanese Civil

23  Proceedings, and O2CNI is an "interested person" in those proceedings. Accordingly, the court

24  moves on to discuss whether the *Intel* factors support exercise of the court's discretion to issue an

25  order pursuant to 28 U.S.C. § 1782.

26     **B. The Court Exercises Its Discretion and Denies the Application**

27     "[A] district court is not required to grant a § 1782(a) discovery application simply because it has

28  the authority to do so." *Intel*, 542 U.S. at 264; *see id.* at 247 ("We caution, however, that § 1782(a)

C 13-80125 CRB (LB)
ORDER

**UNITED STATES DISTRICT COURT**
For the Northern District of California

1   authorizes, but does not require, a federal district court to provide judicial assistance to foreign or

2   international tribunals or to 'interested person[s]' in proceedings abroad.").  Instead, the court must

3   look to several factors that have been outlined by the Supreme Court before exercising its discretion

4   to grant or deny the application.  The court examines these factors in turn below.

5       *1.  Whether Symantec Corporation and Mr. Owyang Are Participants in the Foreign*

6          *Proceedings*

7       The first *Intel* factor requires the court to look to whether the "person from whom discovery is

8   sought is a participant in the foreign proceeding."  *Intel*, 542 U.S. at 264.  The Supreme Court

9   explained that "when the person from whom discovery is sought is a participant in the foreign

10  proceeding . . . , the need for § 1782(a) aid generally is not as apparent as it ordinarily is when

11  evidence is sought from a nonparticipant in the matter arising abroad" because "[a] foreign tribunal

12  has jurisdiction over those appearing before it, and can itself order them to produce evidence."  *Id.*

13  (citations omitted).   "In contrast," the Court continued, "nonparticipants in the foreign proceeding

14  may be outside the foreign tribunal's jurisdictional reach; hence, their evidence, available in the

15  United States, may be unobtainable absent § 1782(a) aid."  *Id.* (citation omitted).

16      Here, O2CNI argues that Symantec Corporation and Mr. Owyang are not participating in the

17  Korean Criminal Proceedings or the Japanese Civil Proceedings.  Memo, ECF No. 2 at 20.

18          *a.  The Korean Criminal Proceedings*

19      As to the Korean Criminal Proceedings, O2CNI points to Symantec Corporation's and Mr.

20  Owyang's refusals to respond to the Korean authorities' formal "Requests to Appear."  *Id.*  It also

21  challenges Respondents' assertion that "Symantec" and Mr. Owyang are participants in the Korean

22  Criminal Proceedings by noting that only Symantec Korea—as opposed to Symantec

23  Corporation—has provided documents or testimony to the Korean authorities and that Mr. Owyang

24  has declined to travel to Korea to appear.  Reply, ECF No. 26 at 9-10.

25      Symantec and Mr. Owyang apparently are suspects in the Korean criminal investigation.  If they

26  are charged, they become participants.  The issue is how this tension in the context of this criminal

27  case bears on the court's discretionary decision to order discovery.  The court's view is that under

28  the particular facts of this case, the factor weighs in favor of letting the evidence in that case develop

C 13-80125 CRB (LB)
ORDER

UNITED STATES DISTRICT COURT
For the Northern District of California

through the criminal authorities investigating it.

The court appreciates that section 1782(a) covers criminal investigations conducted before formal accusation, and O2CNI as a victim and complainant is an interested party to the Korean criminal investigation. *See Intel*, 542 U.S. at 256. But the court is not required to grant discovery just because the statute allows it. *See id.* at 264; *Lazaridis,* 760 F. Supp. 2d at 112. While a corporation may provide assistance to criminal authorities investigating a case, ordinarily, that entails a corporation's cooperation with the investigating authorities by providing its own information and records. And this is more than a subpoena directed at a third party with relevant information: O2CNI wants to act as investigator for the Korean authorities against the entities that it wants the Korean authorities to charge. If Korean authorities want more information from the respondents, they can use the MLAT process, which can subject Mr. Symantec and Mr. Owyang to production of evidence and thus renders them closer to "participants" within the meaning of *Intel*. *Cf. Intel*, 542 U.S. at 264; *see Lazaridis*, 760 F. Supp. 2d at 115 (making a similar point).

### b.   The Japanese Civil Proceedings

As for the Japanese Civil Proceedings, O2CNI says that it does not anticipate (and has never suggested that it anticipates) suing Mr. Owyang. *Id.* at 10. This is borne out by O2CNI's failure to include him as a party to its motion for a preliminary injunction. And although O2CNI has named Symantec Corporation as a party to its motion for a preliminary injunction, it argues that Symantec Corporation "has not confirmed its submissions or otherwise that it will participate" in the proceedings and that Symantec Corporation's failure to participate in the Korean Criminal Proceedings suggests that it will likewise fail to participate in the Japanese ones, too. *Id.* at 10-11.

Symantec Corporation responds that the Japanese litigation is hypothetical and a tack-on to what really is a request in furtherance of the Korean criminal investigation. Opposition, ECF No. 20 at 11-12. Also, Symantec Corporation is named, and Japanese courts can order document production and witness testimony for parties located abroad. *Id.* at 12; Mori Decl., ECF No. 20-4, ¶¶ 6-8. Symantec Corporation also says that the venue provisions under the O2CNI-Symantec contracts are in London, and England's procedural rules require a party located abroad to disclose relevant evidence and make witnesses available. Opposition, ECF No. 20 at 12; Hitchins Decl., ECF No. 20-

UNITED STATES DISTRICT COURT
For the Northern District of California

C 13-80125 CRB (LB)
ORDER

5, ¶¶ 6-7, 10-17.

The court's view is that the civil litigation is hypothetical or at best in the very early stages, the forums (Japan or the London contract venue) provide a means for obtaining evidence, and if the litigation became less hypothetical and did not provide a means to access information, O2CNI could renew its request.  On this record and at this stage, the request is at best premature.

> ### 2.  The Nature of the Foreign Tribunals, the Character of the Proceedings, and the Receptivity of the Foreign Governments or the Court or Agency Abroad to U.S. federal court Judicial Assistance

The second *Intel* factor requires the court to "take into account the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance." *Intel*, 542 U.S. at 264.  To these points, O2CNI argues that because both Korea and Japan have entered into MLATs with the United States, it may be inferred that courts in Korea and Japan are receptive to receiving discovery from the United States.  Application, ECF No. 2 at 21 (citing *In re Application of Imanagement Servs. Ltd.*, No. Civ. A 05-2311 (JAG), 2006 WL 547949, at \*4 (D.N.J. Mar. 3, 2006) (citing *In re Servicio Pan Americano de Proteccion*, 354 F. Supp. 2d 269, 274 (S.D.N.Y. 2004))).  And it notes that Korean and Japanese authorities have made use of the MLATs to ask United States authorities for help gathering evidence.  *Id.* at 22 (citing *In re Letters Rogatory from Tokyo Dist. Prosecutor's Office, Tokyo, Japan*, 16 F.3d 1016 (9th Cir. 1994); *In re Request for Judicial Assistance from Seoul Dist. Criminal Court, Seoul, Korea*, 555 F .2d 720 (9th Cir. 1977); *In re Letters Rogatory from Tokyo Dist., Tokyo, Japan*, 539 F.2d 1216, 1217 (9th Cir. 1976)).  Lastly, it highlights the lack of evidence suggesting that the Japanese authorities, at least, would be *un*receptive to receiving discovery from the United States.  *Id.*

Respondents do not challenge these points.  Instead, they argue that O2CNI has offered no persuasive evidence that either the Korean authorities or the Japanese court want additional discovery (or even know about the volume of discovery sought by O2CNI here).  Opposition, ECF No. 20 at 12-14.  They also point out that neither the Korean authorities nor the Japanese court have attempted to get evidence from the United States, and they surely are aware of the MLAT process.

UNITED STATES DISTRICT COURT
For the Northern District of California

1    *Id.* at 13.  Lastly, Respondents suggest that comity concerns should caution the court from granting

2    O2CNI's Application.  *Id.* at 14.

3        The court's view is that on this record, this factor does not tip one way or the other, especially in

4    light of the Supreme Court's discussion of this issue in *Intel*.  There, the Court "question[ed]

5    whether foreign governments would be offended by a domestic prescription permitting, but not

6    requiring, judicial assistance."  *Intel*, 542 U.S. at 243-44.  As the Court explained:

7        A foreign nation may limit discovery within its domain for reasons peculiar to its own
         legal practices, culture, or traditions; such reasons do not necessarily signal objection

8        to aid from United States federal courts. A foreign tribunal's reluctance to order
         production of materials present in the United States similarly may signal no

9        resistance to the receipt of evidence gathered pursuant to § 1782(a).

10   *Id.* at 244.

11                    ### 3. The Evasion of Foreign Proof Gathering Restrictions

12       The third *Intel* factor requires the court to "consider whether the § 1782(a) request conceals an

13   attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or

14   the United States."  *Intel*, 542 U.S. at 264.  In this regard, O2CNI states that it "is not aware of any

15   rule of legal maxim in Korea or Japan that would preclude or restrict [it] from seeking or obtaining

16   discovery in the United States under Section 1782."  Memo, ECF No. 2 at 22 (citing Tosaki

17   Declaration, ECF No. 3 ¶ 6; Son Declaration, ECF No. 4 ¶ 6); *see also* Reply, ECF No. 26 at 13-14.

18   On the other hand, O2CNI states that there are no mechanisms under Korean law that would permit

19   Korean authorities to compel Symantec Corporation or Mr. Owyang to give testimony or produce

20   documents in the United States in aid of the criminal investigation currently underway in Korea

21   without the assistance of the United States government or judiciary.  *Id.* at 12, 22 (citing Son

22   Declaration, ECF No. 4 ¶ 5).  It also states that while a Japanese court may order a party to produce

23   documents or provide testimony in connection with a civil litigation, the Japanese court does not

24   have jurisdiction to order the production of documents by a third party located in the United States,

25   nor would it have jurisdiction to compel a third party outside of Japan to provide testimony.  *Id.* at

26   13, 23 (citing Tosaki Declaration, ECF No. 3 ¶¶ 4-5).

27       As discussed above in the section titled ***Participants***, while complainants provide information all

28   the time to criminal authorities to assist in the investigation, it is an extra and perhaps unusual effort

C 13-80125 CRB (LB)
ORDER

13

UNITED STATES DISTRICT COURT
For the Northern District of California

1    to use tools also available to those authorities through the MLAT process.  And who knows what

2    safeguards—such as act of production immunity—might apply in a criminal investigation when an

3    agency uses its ordinary investigative tools to acquire information.  The MLAT process provides

4    safeguards appropriate to a criminal case when the evidence is sought from the suspects themselves.

5    Again, the court understands that section 1782(a) allows the process for criminal investigations, and

6    this is not a categorical rule against it.  But the court does not see how granting the request in this

7    case would be an exercise of discretion that furthers the twin aims of the statute of (1) efficient

8    means of assistance to participants in international litigation and (2) encouraging reciprocity to our

9    courts.  *See Schmitz*, 376 F.3d at 84.  The MLAT process accomplishes both aims in the fact-specific

10   context of this case.

11       As to the potential Japanese civil litigation, as the court said above, the request is premature.  If

12   the litigation becomes actual and the forum does not provide a means of obtaining evidence, O2CNI

13   may renew its request.

14                    *4.  O2CNI's Requests Are Unduly Burdensome*

15       Finally, under the fourth *Intel* factor, "unduly intrusive or burdensome requests may be rejected

16   or trimmed."  *Intel*, 542 U.S. at 264.  O2CNI's requests are unduly burdensome.

17       As the chart shows, the document requests are very broad and involve proprietary information

18   that may or may not be relevant to restitution in a criminal proceeding but would be protected in a

19   civil case.  Symantec Corporation's investigations could be privileged and work product.  Many of

20   the requests call for "all documents and things" for long time periods for many Symantec services.

21   The e-discovery that is contemplated is voluminous on its face and would be expensive.

22       In a civil case, the court could fashion limits to address these issues.  But as described

23   previously, any civil litigation is preliminary, the contemplated forum appears to provide an

24   opportunity for discovery, and if it does not, O2CNI may renew its request.  Nothing suggests early

25   discovery through the section 1782(a) mechanism is appropriate or supports the twin aims of the

26   statute.

27       Instead, the relevance now is in aid of the criminal investigation.  The court already discussed its

28   view that it should not allow the discovery on this record.  In addition, the burdens would not justify

C 13-80125 CRB (LB)
ORDER
                                                    14

1  the discovery that O2CNI requests.

2                                                **CONCLUSION**

3      In the exercise of its discretion, the court denies O2CNI's request and quashes the subpoenas.

4  Granting discovery in aid of the Korean Criminal Proceedings is not appropriate on this record.  On

5  this record, discovery in relation to the Japanese Civil Proceedings is premature, apparently

6  available through any foreign forum, and burdensome.  The court denies the request for civil

7  discovery without prejudice.

8      This disposes of ECF No. 1.

9  **IT IS SO ORDERED.**

10  Dated: August 15, 2013                    _____

11                                            LAUREL BEELER
                                              United States Magistrate Judge

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**UNITED STATES DISTRICT COURT**
For the Northern District of California